Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Arlander Keys | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 7953 | **DATE** | 2/28/2001 |
| **CASE TITLE** | Elda Arnhold, et al vs. Ocean Atlantic Woodland Corp. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1)  ☐  Filed motion of [ use listing in "Motion" box above.]

(2)  ☐  Brief in support of motion due _____.

(3)  ☐  Answer brief to motion due_____.  Reply to answer brief due_____.

(4)  ☐  Ruling/Hearing on _____ set for _____ at _____.

(5)  ☐  Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6)  ☐  Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7)  ☐  Trial[set for/re-set for] on _____ at _____.

(8)  ☐  [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9)  ☐  This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
         ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■  [Other docket entry]  Enter Memorandum Opinion and Order.  The Court denies Defendant's Motion to Enforce Settlement Agreement (61-1). Plaintiffs' Motion for Declaratory Judgment that the settlement agreement was properly terminated by Plaintiffs (66-1) is granted.  AK

(11) ■  [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 7 | **Document Number** |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | MAR 0 1 2001 | 70 |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | ŲD | C.S. | |
| | Mail AO 450 form. | ...O FOR DOCKETING | docketing deputy initials | |
| | Copy to judge/magistrate judge. | ŲI FEB 28 PM 2:09 | 2/28/2001 | |
| | | | date mailed notice | |
| VKD | courtroom deputy's initials | | VKD | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ELDA ARNHOLD, and | ) | |
| BYZANTIO, LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | No. 99 C 7953 |
| | ) | |
| v. | ) | |
| | ) | Magistrate Judge |
| OCEAN ATLANTIC WOODLAND | ) | Arlander Keys |
| CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant Ocean Atlantic Woodland
Corporation's ("Ocean Atlantic") Motion to Enforce Settlement
Agreement. Because the Court finds that Ocean Atlantic breached a
material term of the Settlement Agreement, and for the reasons set
forth below, Ocean Atlantic's Motion is denied with prejudice.
Furthermore, the Court finds that the Settlement Agreement, entered
into between the parties on October 26, 2000, has been properly
terminated, pursuant to its terms, and accordingly, Ocean Atlantic
has no rights with respect to the Property at issue in the case *sub
judice*.

## FACTUAL BACKGROUND

This controversy illustrates the truth inherent in the cliche:
"There are two sides to every story." After reading Ocean

Atlantic's Memorandum in Support of its Motion To Enforce Settlement Agreement ("Def.'s Memo."), the Court was led to believe that there was no significant context to paragraph 15[1] of the October 26, 2000 Settlement Agreement, and that, therefore, Ocean Atlantic's noncompliance with the unambiguous terms of this paragraph was merely technical, and certainly not a material breach. However, after reading Plaintiff's Response, and carefully observing the testimonial demeanor of the witnesses at the February 14-15, 2001 hearing, the Court finds that paragraph 15 was not drafted in a vacuum, but rather has an almost four-year contentious history, and was certainly an essential (if not "the" essential) term of the Settlement Agreement.

While Ocean Atlantic requests the Court to enforce a

---

[1] Paragraph 15 of the Settlement Agreement, which is at the crux of this controversy, states: "It is intended by Sellers and Purchasers that January 25, 2001 shall be an absolute final date for Closing subject only to Sellers' default, as found by the Court, or Sellers' failure to participate in or fully cooperate with Purchaser to effectuate the Closing on the date selected by Purchaser, as found by the Court. If Closing has not occurred on or before January 25, 2001, for any reason other than Sellers' default, as found by the Court, or Sellers' failure to participate in or fully cooperate as set forth herein, as found by the Court, Purchaser shall have no right to purchase or otherwise encumber the Property or Homestead parcel, the Contract shall be terminated and Purchaser shall have no rights with respect to the Property or Homestead Parcel." (October 26, 2000 Settlement Agreement at ¶ 15.)

Settlement Agreement that was entered into between the parties on October 26, 2000, the parties' real controversy, undisputedly, began in August 1997. This almost four-year raging battle, culminating in the year 2000 Settlement Agreement, concerns the purchase and sale of a certain parcel of farm land containing approximately 280.27 acres of land located in Plainfield Township, Will County, Illinois (hereinafter referred to as the "Property"). In order to fully understand the context surrounding the 2000 Settlement Agreement, it is necessary to give a brief synopsis of the ongoing disputes between the parties.

## A. The Context Behind the Year 2000 Settlement Agreement

The Plaintiffs are Elda Arnhold, a 78-year-old woman and life-long farmer who owns and lives on her family farm outside of Plainfield, and Frank Argoudelis, also a life-long farmer, and his family ("Byzantio") who own a farm adjoining the Arnhold farm. On August 6, 1997, the Arnhold and Argoudelis families (hereinafter referred to collectively as the "Sellers" or "Plaintiffs") entered into a contract to sell their farm land (i.e. the Property) to Ocean Atlantic, a large land development company, for the purchase price of $7,560,000. This original contract contemplated an initial closing by November, 1997, and required that the initial closing, or specified conditions for closing, occur no later than

August 6, 1998, or either party would have the right to terminate the contact.[2]

Not surprisingly, the First Closing did not occur on August 6, 1998. According to Plaintiffs, Ocean Atlantic did not work diligently to facilitate closing and, consequently, failed to meet the deadlines set forth in the contract. Ocean Atlantic, on the other hand, claims that Plaintiffs refused to cooperate with needed steps to facilitate the First Closing.[3] Despite the abundant hearing testimony concerning these issues, it is not germane to the present controversy as to whom was at fault in these initial disagreements. The critical point is that, in 1998, the parties' business relationship deteriorated, and the First Closing did not

---

[2] The initial contract contemplated three separate closings regarding three separate parcels of the Property. The contract stated that, if the "First Closing" had not occurred – or if the conditions for closing had not been satisfied – within 12 months of the contract's effective date (which was August 6, 1997), then either party had the right to terminate the contract. (See Plaintiffs' Response, Exh. A, at 8(g)). As explained infra, the First Closing did not occur by August 6, 1998, and the initial contract was amended several times to extend the deadlines set forth in the contract.

[3] The contract called for closing to occur after completion of certain events such as rezoning, annexation of the Property to the Village of Plainfield, and other developmental steps needed to transform the raw acreage into lots.

-4-

occur.  (Tr. at 100.)[4]

Nevertheless, the parties agreed to a series of date extensions, which were embodied in the First Amendment, executed on November 10, 1997[5] (Plaintiff's Exh. 2[6]), and then a Second Amendment, executed on or about April 14, 1999 (Plaintiff's Exh. 1).  The Second Amendment extended the First Closing date to no later than November 30, 1999, but, once again, the First Closing

---

[4] References are to the official transcript of the February 14-15, 2001 hearing.

[5] Apparently, after the First Amendment, Ocean Atlantic filed a federal lawsuit, in November 1998, requesting specific performance for Plaintiffs to sign the petition and annexation agreement, a necessary step for closing pursuant to the contract and First Amendment.  According to Plaintiffs, they signed the petition and annexation agreement on December 1, 1998 (Pl.'s Exh. 6), but were, nonetheless, still served with the lawsuit in January 1999. (Tr. at 32, 292.)  In April 1999, Ocean Atlantic voluntarily dismissed the lawsuit (and the Second Amendment was executed).  The only relevance of this dispute to the present controversy is that it underscores the tension between the parties, and further illustrates, as will be discussed in more depth *infra*, that a specific closing date was always important to Plaintiffs. For instance, paragraph 13 of Ocean Atlantic's Complaint for Specific Performance, in case No. 98 C 7140, states that Plaintiffs refused to execute the necessary petition and annexation agreement unless Ocean Atlantic committed to a first closing date no later than December 31, 1998.  Therefore, as early as November 1998, Ocean Atlantic knew that Plaintiffs were insistent on specific dates for closing.

[6] References to "Pl.'s Exh." or "Def.'s Exh." are exhibits that were entered into evidence at the hearing held on February 14-15, 2001.

-5-

did not occur by this date. According to Plaintiffs, Ocean Atlantic failed to abide by its promises and obligations, for example, by failing to seek final engineering approval from the Village of Plainfield, which would have triggered a mandatory closing date within 30 days thereafter. Conversely, on or about November 8, 1999, Ocean Atlantic maintained that the Village of Plainfield had imposed, on August 23, 1999, a moratorium on sewer permits until December 2001, which necessitated an extension of the November 30, 1999 closing date.[7]

Believing that Ocean Atlantic was concocting yet another delay tactic, on November 22, 1999, Plaintiffs filed a lawsuit in federal court for declaratory judgment that the contract would be terminated if the First Closing did not occur by November 30, 1999, pursuant to the Second Amendment. Ultimately, Judge Holderman denied Plaintiffs' summary judgment motion, and in the Fall of

---

[7] Plaintiffs dispute that there was a "sewer moratorium" in effect in the Village of Plainfield. (Tr. at 299-301.) Again, it is irrelevant to the present controversy whether there was, indeed, a sewer moratorium that legitimately prevented the closing from occurring by November 30, 1999. As explained *infra*, Judge Holderman denied summary judgment on this issue, finding that there were factual issues surrounding whether there was a sewer moratorium. The overriding point is that the parties entered into an October 26, 2000 Settlement Agreement, which waived the past controversies, including the issue of the alleged sewer moratorium, and allowed one last chance to complete the closing by a "drop-dead" specified date.

2000, the parties settled the lawsuit by entering into the October 26, 2000 Settlement Agreement (also referred to as the Third Amendment), the relevant document at issue in this case.

## B. The Settlement Agreement and Ensuing Controversy

A few days before the scheduled trial, the parties entered into the Settlement Agreement, and Plaintiffs dismissed their lawsuit with prejudice. Although Plaintiffs and Ocean Atlantic insist that different parts of the Settlement Agreement were material and significant, the Court finds, based on the almost four-year contentious background between the parties, the circumstances surrounding the execution of the Settlement Agreement (including letters written back and forth between the parties in negotiating the Settlement Agreement (discussed *infra*)), and the testimony at the hearing, that the following were material aspects of the Settlement Agreement: (1) there would be one closing for the full purchase price of the Property (as opposed to three, as the initial contract had contemplated); (2) there would be a final, "drop-dead" date for closing, the language of which was encompassed in paragraph 15; and (3) the issue of the sewer moratorium would be waived.

According to Plaintiffs, they would not have entered into the

Settlement Agreement – and, correspondingly, dismissed their lawsuit with prejudice – if Ocean Atlantic had not agreed to paragraph 15, which stated in no uncertain terms that January 25, 2001 would be a final, absolute date for closing. (Tr. at 305-06, 313.) After an almost four-year relationship, involving several ineffectuated closing dates, two amendments to the initial contract, and two federal lawsuits, Plaintiffs wanted the certainty that by one particular date (in this case, January 25, 2001)[8], either a closing would occur, or the contract would be terminated. Indeed, the whole premise behind their lawsuit for declaratory judgment stemmed from Ocean Atlantic's failure to close by November 30, 1999, as set forth in the Second Amendment. Therefore, it is entirely believable that Plaintiffs would not have settled the lawsuit – and dismissed it with prejudice – unless they were guaranteed an absolute, final, "drop-dead" date for closing in the Settlement Agreement.

Besides the unambiguous language of paragraph 15, Plaintiffs' insistence on a final, "drop-dead" closing date can be gleaned from

---

[8] As explained by Mr. Argoudelis at the hearing, the specific date of January 25, 2001 – which was chosen by Ocean Atlantic – was not important *per se*. Rather, the significance lay in the certainty that, whatever date was selected, that date would become the final, "drop-dead" date. (Tr. at 325-26, 329.)

the correspondence between the parties during the settlement negotiations. For example, in a September 7, 2000 letter from William Farrell, counsel for Ocean Atlantic, to Theodore Poulos, counsel for Plaintiffs, Mr. Farrell acknowledged that Plaintiffs would consider settlement only if the agreement included: (1) an amendment to the existing contract setting a closing date or dates without the possibility of extensions or delays; (2) the absolute right of Plaintiffs to terminate the contract in the event of failure to close on the set closing date(s); (3) that such closing date(s) would occur "quickly"; and (4) that payment of the full purchase price would be made at closing.[9] (Pl.'s Response, Exh. D, Sept. 7, 2000 letter; Tr. at 308.)  In this same letter, Mr. Farrell represented that Ocean Atlantic would agree to settlement

---

[9] Ocean Atlantic attempts to minimize the significance of January 25, 2001 as a "drop-dead" date, by arguing that its selection was arbitrary, as evidenced, in part, by Mr. Argoudelis' hearing testimony that there was no particular significance to January 25, 2001, and that Plaintiffs likely would have agreed to January 26, 2001 as the "drop-dead" date. (Tr. at 228-31, 325-26.)  Ocean Atlantic further contends that the key point of the Settlement Agreement was that a closing date be selected "quickly" (meaning approximately 90 days after the execution of the Settlement Agreement), and that the entire purchase price be paid at one closing.  (Tr. at 229-30.)  Despite Ocean Atlantic's attempt to minimize the significance of January 25th, the pivotal point is that, once Ocean Atlantic selected January 25, 2001 as the absolute, final "drop-dead" date, then January 25, 2001 became significant and material to the Settlement Agreement.

on terms that included the following:

> Ocean Atlantic will agree that failure to close within 45 days[10] of the execution of the amendment [i.e. settlement] shall result in Plaintiffs' unequivocal right to terminate the contract.

*Id.*

As the parties finalized the specific terms of the Settlement Agreement, the significance of the "drop-dead" date for closing continued to be emphasized. In an October 23, 2000 letter to Ocean Atlantic's counsel, for instance, counsel for Sellers stated that an essential and material term of any settlement was that "[i]f Ocean Atlantic, for any reason whatsoever, fails to close on the property within 90 days from the execution of [the] settlement document, it shall forfeit any and all rights it may have to purchase the property." (Pl.'s Response, Exh. E, Oct. 23, 2000 letter.) Significantly, in response, Ocean Atlantic sent Sellers a draft settlement agreement, which contained the precursor to paragraph 15 of the final Settlement Agreement, which stated:

> 13. If Closing has not occurred on or before January 25, 2001, for any reason other than Seller's failure to participate in a scheduled Closing, the Contract, as amended, shall terminate. It is intended by Sellers and Purchasers that January 25,

---

[10] As explained *infra,* the 45 days was ultimately changed to 90 days, and the "drop-dead" date of January 25, 2001 was actually 91 days after the execution of the Settlement Agreement.

> 2001 shall be an absolute final date for Closing
> and control over any other provision herein.

(Pl.'s Response, Exh. F. Oct. 23, 2000 draft settlement agreement.)

By comparison, paragraph 15 of the final Settlement Agreement reads:

> It is intended by Sellers and Purchasers that January 25,
> 2001 shall be an absolute final date for Closing subject
> only to Sellers' default, as found by the Court, or
> Sellers' failure to participate in or fully cooperate
> with Purchaser to effectuate the Closing on the date
> selected by Purchaser, as found by the Court. If Closing
> has not occurred on or before January 25, 2001, for any
> reason other than Sellers' default, as found by the
> Court, or Sellers' failure to participate in or fully
> cooperate as set forth herein, as found by the Court,
> Purchaser shall have no right to purchase or otherwise
> encumber the Property or Homestead parcel, the Contract
> shall be terminated and Purchaser shall have no rights
> with respect to the Property or Homestead Parcel.

(October 26, 2000 Settlement Agreement at ¶ 15.)

Therefore, Ocean Atlantic helped draft the very language that it now attacks as not material to the Settlement Agreement. Clearly, Ocean Atlantic knew – from the settlement negotiations – that a final, "drop-dead" closing date had to be an integral part of any final settlement agreement. Recognizing this, Ocean Atlantic drafted language that it hoped would motivate – or entice – Plaintiffs into settling the lawsuit.

On January 3, 2001, consistent with the provisions set forth in the Settlement Agreement, Ocean Atlantic selected January 24,

-11-

2001 - one day before the "drop-dead" date provided for in the Settlement Agreement - as the closing date. Although Ocean Atlantic had approximately seventy specific days from which to choose for its closing (before January 25, 2001), it chose the day before the last to commence closing.[11]

At all times, Plaintiffs made it explicitly clear that the closing needed to be finalized by the "drop-dead" date of January 25, 2001, as set forth in the Settlement Agreement. In a January 22, 2001 letter, Plaintiffs' counsel reaffirmed to Ocean Atlantic the significance of the "drop-dead" closing date: "If the closing does not occur in accordance with the terms of the settlement agreement, your clients will have no rights whatsoever to the property after January 25, 2001 as clearly spelled out in that same

---

[11] During the hearing, Mr. Farraguto, President of Ocean Atlantic, tried to explain why, essentially, 69 of those 70 days would not have worked as closing dates, as Ocean Atlantic needed time to coordinate the closing, which now involved paying the full purchase price for the Property in one closing (as opposed to three). (Tr. at 37-38, 179-80.) But, unclear to the Court (and apparently to Plaintiffs), is why Ocean Atlantic chose January 24, 2001 as the closing date, and otherwise agreed to a "drop-dead" final date for closing of January 25, 2001, if it knew that the complexity of the deal - encompassing loan guarantees, etc. - would likely - or even could potentially - pose a timing problem. In any event, as explained in more detail *infra*, Mr. Farraguto's testimony was largely incredible, and will only be credited to the extent that it is consistent with other evidence before the Court.

settlement agreement." (Pl.'s Response, Exh. J, Jan. 22, 2001
letter from Theodore Poulos to William Farrell.) Significantly,
Ocean Atlantic - on that same day - acknowledged, by letter, the
importance of closing on or before January 25, 2001: "Please be
advised that Ocean Atlantic will fully participate in the scheduled
closing this Wednesday [January 24, 2001] at 9:00 a.m. pursuant to
the settlement agreement." (Pl.'s Response, Exh. K, Jan. 22, 2001
letter from William Farrell to Theodore Poulos.)

Nonetheless, closing did not occur on January 24, 2001 - the
day selected by Ocean Atlantic - nor January 25, 2001, the
absolute, final "drop-dead" date in the Settlement Agreement. It
is undisputed that Plaintiffs (i.e. the Sellers) were entirely
ready, willing and able to close on January 24, 2001.[12] They

---

[12] Although Mr. Farraguto insinuated, at one point during
the hearing, that Plaintiffs were in some way at fault in the
failure to close on January 24, 2001 (Tr. at 109), his own
attorneys admit that Plaintiffs fully cooperated with the closing
on January 24, 2001. As explained *infra*, Mr. Farraguto's
testimony is largely incredible, and the Court will dismiss his
subtle accusations that Plaintiffs were, at some level, not fully
cooperating. Indeed, there is evidence that Ocean Atlantic -
perhaps, foreseeing that closing would be a problem on January
24, 2001 - tried to change material terms of the Settlement
Agreement in the weeks before the "drop-dead" closing date. On
January 18, 2001, for instance, Ocean Atlantic sent a letter to
Sellers, claiming, for the first time, that Sellers were
responsible for paying approximately $680,000 in development
fees. (*See* Pl.'s Response, Exh. G, Draft Closing Statement; Tr.
(continued...)

arrived at 9:00 a.m. at Chicago Title and Trust Company in Wheaton,
Illinois to close pursuant to the Settlement Agreement. On January
24, 2001, at 7:00 p.m., Plaintiffs were informed that the closing
would not occur, as the funds would not be deposited in escrow that
day. (Tr. at 322.) Yorkville National Bank – Ocean Atlantic's
lender – had refused to give Ocean Atlantic the necessary loan,
until Ocean Atlantic provided additional security in the form of a
written guarantee from a third-party entity located in New York
City (Black Acre Capital Group). (Tr. at 71.) Consequently,
because Ocean Atlantic had not perfected its security, the funds
were not placed in the escrow account for disbursement on January
24th – the day Ocean Atlantic had selected for the closing – nor on

---

[12](...continued)
at 75-76, 314-16.) At one point, according to Mr. Argoudelis,
Ocean Atlantic offered to drop its demand for the development
fees if Sellers would agree to extend the closing date to May 1,
2001. (Tr. at 317.) Since paying these fees had never been
discussed, nor embodied in the Settlement Agreement, Sellers
refused to acquiesce, and ultimately (probably realizing the
inherent weakness in trying to extort nearly 10% of the purchase
price on the eve of closing), Ocean Atlantic retreated from this
demand. (*Id.*) Moreover, there is evidence that, on January 24,
2001, Ocean Atlantic offered Plaintiffs approximately $200,000
(which they rejected) if they would agree to extend the "drop-
dead" closing date to sometime in May. (Tr. 119, 321-23.) The
point of these examples is that it was Ocean Atlantic – not
Plaintiffs – that tried to alter material terms of the Settlement
Agreement in the weeks before the absolute, final "drop-dead"
date of January 25, 2001.

January 25, 2001, the absolute, final "drop-dead" date for closing.[13]

Ocean Atlantic fervently maintains that it worked diligently from January 24, 2001 to January 26, 2001 to effectuate the closing, and that the process was completed on January 25, 2001 – with one exception: disbursement of the purchase funds to Sellers was not possible until January 26, 2001.[14]  On January 26, 2001, however, Plaintiffs informed Ocean Atlantic that they were terminating the Settlement Agreement pursuant to its terms in paragraph 15, and that Ocean Atlantic had forfeited all rights to the Property.

---

[13] Ocean Atlantic maintains that it had no way of foreseeing that its lender, Yorkville National Bank, would require additional security in the form of a third-party guarantee.  (Tr. at 43-44.)   Assuming this is true (the Court has its doubts), it is immaterial.  Ocean Atlantic is a large, experienced land development company and either should not have waited until January 24, 2001 to commence closing, or should not have agreed to a final, "drop-dead" closing date of January 25, 2001, if it had any doubts as to whether it would be able to complete the necessary paperwork by this time.

[14] Incredulously, Mr. Farraguto emphasized, at the hearing, that Ocean Atlantic had the check written out to Plaintiffs for the full purchase price of the Property on January 24, 2001 (*see* Def.'s Exh. 1), thereby insinuating that Ocean Atlantic had met its obligations to close under the Settlement Agreement.  (Tr. at 41.)   When the Court asked Mr. Farraguto if Plaintiffs could have negotiated, or deposited the check that day, Mr. Farraguto "clarified" and said that the check could not be released on January 24, 2001.  (*Id.*)

-15-

On February 7, 2001, Ocean Atlantic filed its Motion to Enforce the Settlement Agreement, the present Motion before the Court. On February 13, 2001, Plaintiffs filed their Response, which provided the necessary background to the Settlement Agreement (and the other side to the story). On February 14 and 15, 2001, this Court held an evidentiary hearing, and heard from Mr. Farraguto, Ocean Atlantic's President, and Mr. Argoudelis, one of the Plaintiffs and an attorney of record for Plaintiffs. Both parties filed post-hearing briefs. The Court, after fully considering the briefs and the hearing testimony, concludes that Ocean Atlantic breached a material term of the Settlement Agreement, and accordingly, has forfeited all rights to the Property.

Before delving into the legal analysis, the Court will first comment on the hearing testimony provided by Mr. Farraguto and Mr. Argoudelis. After carefully observing the testimonial demeanor of both witnesses, the Court finds that the testimony of Mr. Farraguto was largely incredible,[15] and that the testimony of Mr. Argoudelis

---

[15] While there is practically a cornucopia of examples from which to choose, the Court provides a few examples of Mr. Farraguto's contradictions and misstatements at the hearing: Although Ocean Atlantic's attorneys tendered affidavits from Daniel J. Kramer, an attorney for Yorkville National Bank (Def.'s
(continued...)

was entirely credible and consistent with the other evidence before the Court. Therefore, to the extent Mr. Farraguto and Mr. Argoudelis' testimony conflicts, the Court credits Mr. Argoudelis' testimony.

## ANALYSIS

A motion to enforce a settlement agreement is essentially the same as a motion to enforce a contract. *Capri Sun, Inc. v. Beverage Pouch Systems, Inc.*, No. C. 1961, 2000 WL 1036016, at * 2

---

[15](...continued)
Exh. 3), and Gail Lulling, a closing officer at Chicago Title (Def.'s Exh. 4) stating that the loan proceeds were not deposited into escrow and available for disbursement until January 26, 2001, Mr. Farraguto, at the hearing, testified on direct examination that the money was actually put into escrow in the afternoon of January 25, 2001. (Tr. at 47.) On cross-examination, when confronted with these affidavits submitted by his own attorneys, he admitted that the money was not put into escrow until January 26, 2001. (Tr. at 110-11.) Of course, when the money was available for Plaintiffs to complete closing is the key issue in this controversy, and certainly Mr. Farraguto knew that the money was not placed in escrow and ready for disbursement until January 26, 2001. Furthermore, despite being an experienced real estate developer (Tr. at 24), Mr. Farraguto refused to admit that the definition of "closing" involved the purchaser giving a check (that could be cashed) to sellers for the purchase price of the property. (Tr. at 105.) Mr. Farraguto also stated that he had "insisted that 'time is of the essence' be taken out [of the Settlement Agreement]." (Tr. at 118.) But, when pressed, Mr. Farraguto reluctantly admitted that this clause "time is of the essence" had *never* been in one of the original drafts of the Settlement Agreement. (*Id.*) While there are a myriad of other examples of Mr. Farraguto's less than candid answers, these provide a taste of his incredible testimony.

(N.D. Ill. July 21, 2000)(citing *Allstate Financial Corp. v. Utility Trailer of Illinois, Inc.*, 936 F. Supp. 525, 527 (N.D. Ill. 1996)). Assuming that it has jurisdiction to enforce a settlement agreement,[16] a federal court will look to the applicable state law in construing the terms of the agreement. *Id.* In Illinois, ordinary contract construction rules apply to a settlement agreement. *Id.*

The crux of this case is whether paragraph 15 of the Settlement Agreement, which provides, in pertinent part, that, "January 25, 2001 shall be an absolute, final date for Closing" and that if "Closing has not occurred on or before January 25, 2001 . . . Purchaser shall have no right to purchase or otherwise encumber the Property", is a material part of the contract, thereby justifying non-performance by Plaintiffs, because of Ocean Atlantic's breach of that provision. *See Arrow Master, Inc. v. Unique Forming Ltd.*, 12 F.3d 709, 714 (7th Cir. 1993)(stating black letter law that, in Illinois, only a material breach of a contract justifies non-performance by the other party). Under Illinois law, in determining whether failure of performance constitutes a

---

[16] In the case *sub judice*, the Court has proper jurisdiction pursuant to 28 U.S.C. § 1332 based upon complete diversity of citizenship between Ocean Atlantic and Plaintiffs.

material breach of the contract provision, the court asks whether performance of that provision was a *sine qua non* of the contract's fulfillment. *Id.* at 715; (citation omitted). In other words, would the parties have entered into the contract (in this case, the Settlement Agreement) without the particular provision at issue in the contract (in this case, paragraph 15).

In the case *sub judice*, there is no question that Plaintiffs would not have entered into the Settlement Agreement without paragraph 15, which unequivocally states that, "[i]t is *intended* by Sellers and Purchaser that January 25, 2001 shall be *an absolute final date for Closing.*" (Emphasis added.) Indeed, it is black letter law in Illinois that "the primary object in construing a contract is to give effect to the *intention of the parties.*" *Arrow Master, supra* at 713 (citation omitted)(emphasis added). And, in the case at bar, paragraph 15 clearly states the intention of the parties. In fact, Mr. Farraguto, despite his best efforts, admitted as much at the hearing, conceding that one of the three reasons for the Settlement Agreement was for the closing to occur on or before January 25, 2001. (Tr. at 116.) Importantly, there is no law in Illinois that a contract cannot have more than one material provision.

Additionally, assuming that the language of paragraph 15 is ambiguous (which it is not), the prior dealings and almost four-year contentious history between the parties illustrates that paragraph 15 was a material part of the contract. For instance, during settlement negotiations, the correspondence between the parties (discussed *supra*) clearly illustrates that Plaintiffs were primarily concerned with having a final, absolute date to close, as their lawsuit for declaratory judgment (which they subsequently dismissed with prejudice because of the Settlement Agreement) was solely concerned with Ocean Atlantic's refusal to close by November 30, 1999, pursuant to the Second Amendment. Quite telling is that Ocean Atlantic helped draft the precursor to paragraph 15, using language such as: "It is intended by Sellers and Purchasers that January 25, 2001 shall be the absolute final date for Closing and control over any other provision herein." (Pl.'s Response, Exh. F. Oct. 23, 2000 draft settlement agreement.)[17]

---

[17]  Furthermore, as discussed *supra*, as early as November 1998, Ocean Atlantic knew that Plaintiffs wanted a final closing date, as Ocean Atlantic stated as much in paragraph 13 of its Complaint for Specific Performance in case No. 98 C 7140.  In addition, Mr. Farraguto, on cross-examination, admitted that Mr. Argoudelis had told him, prior to November 30, 1999 (probably in October 1999), that if Ocean Atlantic did not complete the First Closing by November 30, 1999, Plaintiffs believed that they had a right to terminate the contract.  (Tr. at 88-89.)  There is also
(continued...)

Ocean Atlantic, and Mr. Farraguto, apparently believe that the failure of paragraph 15 to state the talismanic phrase "time is of the essence" is significant, and defeats the otherwise unambiguous language of the parties. (Tr. at 132-33, 167, 181, 255.) However, this argument is simply not the law in Illinois. Indeed, it is axiomatic under Illinois law that "the precise phraseology is not important, and the intention of the parties as expressed by the agreement controls." *Will v. Will Products, Inc.*, 441 N.E.2d 343, 346 (Ill. App. Ct. 1982); *see also Anest v. Bailey*, 556 N.E.2d 280, 283 (Ill. App. Ct. 1990) ("[T]he court's inquiry cannot end with the mere recitation of contractual language stating that time is of the essence of the contract. As we have previously noted, the extent to which such a contractual provision should be strictly enforced depends upon the parties' intentions, which are to be determined both by the language used in the agreement and the circumstances surrounding the agreement."; *Janssen Bros., Inc. v. Northbrook Trust & Sav. Bank*, 299 N.E.2d 431, 434 (Ill. App. Ct. 1973) ("The

---

[17](...continued)
evidence that Mr. Petka (attorney of record for Plaintiffs) sent a letter to Mr. Farraguto, in August 1998, stating that ". . . time is of the essence in connection with the setting of a closing date . . .". (Tr. at 186-87.) Therefore, it is quite clear that Mr. Farraguto knew, in 1998, that setting a final closing date was a top priority for Plaintiffs.

settlement agreement before us contained no express provision that time was of the essence, but the precise phraseology is not controlling. Parties to a contract may make timely performance material even though there is no express provision to that effect."); *O'Malley v. Cummings*, 229 N.E.2d 878, 880 (Ill. App. Ct. 1967)("[T]he parties to a contract may make timely performance material even though there is no express provision to that effect.").

Therefore, even if the Settlement Agreement had contained the magical phrase "time is of the essence", this would not be dispositive or end the inquiry, as the Court would still need to look at the parties' intentions, the language of paragraph 15, and the surrounding circumstances – all of which, in this case, clearly show that time really was of the essence. Indeed, it is hard to imagine alternative language for paragraph 15 that could be clearer. Even Mr. Farraguto, again despite his best efforts, reluctantly admitted that the phrase "time is of the essence" actually means "absolute final dates." (Tr. at 184.)[18]

---

[18] Ocean Atlantic, quoting *Sahadi v. Continental Illinois National Bank and Trust Co. of Chicago*, 706 F.2d 193, 198 (7th Cir. 1983), also argues that time requirements, even when attached to explicit termination provisions, are by nature "accessory" rather than central aspects of most contacts. But,

(continued...)

Ocean Atlantic relies on easily distinguishable cases to argue
that its breach was non-material and should not excuse Plaintiffs'
performance. For instance, Ocean Atlantic relies on *Intervisual
Communications, Inc. v. Volkert*, 975 F. Supp. 1092, 1100 (N.D. Ill.
1997), for the well-known proposal that a minor, non-material
breach does not preclude specific performance of contractual
duties. But, *Intervisual*, as with all the cases Ocean Atlantic
cites, must be considered in its appropriate context.[19] In
*Intervisual*, this Court concluded that the plaintiff had waived his
right to assert a breach based on the late payment of royalties,
because he had acquiesced to late payments in the past. *Id.* at
1101. In the case *sub judice*, however, there is no issue of

---

[18](...continued)
it is undisputed that, in Illinois, contracts may make a time
requirement an essential part of the bargain. Indeed, in *In re
Krueger*, 192 F.3d 733, 742 (7th Cir. 1999), the Seventh Circuit
explicitly held that, under Illinois law, parties to a contact
"may make timely performance a material element of the contract."

[19] *Markoff-Fitzgerald Ass'n, Inc. v. Sable Corp.*, No. 85 C
9184, 1990 WL 37669 (N.D. Ill. March 14, 1990) and *Sahadi, supra*,
– other cases that Ocean Atlantic cites – can also be
distinguished from the present controversy. Neither of these
cases involve real estate contracts where closing dates had been
pushed back numerous times. (*Markoff-Fitzgerald* concerns a
garnishment action under the Illinois garnishment statute, and
*Sahadi* concerns a failure to timely pay accrued interest on a
loan agreement.)

waiver, as a final closing date has always been a principal concern of Plaintiffs, as evidenced by the Second Amendment, declaratory judgment action, and Settlement Agreement - as well as the correspondence (discussed *supra*) written just days before January 25, 2001. Additionally, in *Intervisual*, this Court held that, even if there had been no waiver, it was highly unlikely that the agreement would have turned on the condition that all royalty payments be made within thirty days. *Id.* at 1101. Again, in the case at bar, it is quite apparent that Plaintiffs would never have dismissed their lawsuit with prejudice, and entered into the Settlement Agreement, if paragraph 15 - providing for a final, absolute closing date - had not been included.

Similarly, *Chariot Holdings, Ltd. v. Eastmet Corp.*, 505 N.E.2d 1076 (Ill. App. Ct. 1987) is distinguishable from the present controversy. In *Chariot Holdings*, although there was a contract provision that stated that closing must occur by a certain date or termination would result, there was no long and protracted relationship between the parties, where the closing date had been extended several times over the course of almost four years. Furthermore, there was no evidence that the closing date was an

essential part of the contract.[20]

---

[20] Moreover, as pointed out by Plaintiffs, *Chariot Holdings* actually supports Plaintiffs' position, in that it favorably cites *Schneider v. Dumbarton Developers, Inc.*, 767 F.2d 1007 (D.C. Cir. 1985), a case strikingly similar to the one *sub judice*. In *Schneider*, a case with persuasive authority in this jurisdiction, the purchaser was given two postponements of the agreed-upon closing date, both of which the developer had failed to meet. After the purchaser announced that the sale had to be closed by a certain date - or the agreement would terminate - the developer failed to close a third time, and the purchaser sued to have the contract declared void. Similar to the case at hand, the parties in *Schneider* settled their controversy pursuant to a settlement agreement, in which the purchase had to be completed by or on a certain date, providing that, "the time for settlement may not be further extended for any reason whatsoever" and that time was of the essence. *Id.* at 1013. Although the purchasers were willing, ready and able to close at all times within the period allotted for closing (as in the case *sub judice*), the developer chose the last day allowed as the closing date. Identical to the case at hand, problems arose, and the developer was unable to deposit sufficient funds to complete the closing by the last day specified in the settlement agreement. Although the developer argued that its actions constituted substantial performance (after all, it was the disbursement of funds that was not completed), the trial court, nonetheless, held that the agreement was terminated, and the appellate court affirmed, arguing, *inter alia,* that the circumstances surrounding the settlement agreement, as well as the clear language of the agreement, showed that the parties intended time of performance to be a material term of the contract. *Id.* at 1013-14. *Chariot Holdings*, recognizing the distinction between *Schneider* and its facts, concluded that Schneider arose "against a substantially different background than the one before us." *Chariot Holdings*, 505 N.E.2d at 1083. Clearly, the case *sub judice* is more akin to *Schneider* than *Chariot Holdings,* in that the present controversy involves an almost four-year contentious history, with several failed closing dates, and a Settlement Agreement that contains similar language as that in *Schneider*. (Ocean Atlantic's attempt

(continued...)

Finally, Ocean Atlantic asks the Court to apply the four prong-test often used in Illinois courts to determine materiality: (1) whether the breach defeated the bargained-for objective; (2) whether the breach caused a disproportionate prejudice to the non-breaching party; (3) whether custom and practice show the breach to be material; and (4) whether allowance of reciprocal non-performance would result in an unreasonable and unfair advantage to either party. *See Arrow Master*, 12 F.3d at 715 (citation omitted). These factors, however, do not detract from the fundamental materiality inquiry: whether the parties would have entered into the contract without the particular provision at issue. *Id.* at 714; *see also Francorp, Inc. v. Siebert,* 126 F. Supp.2d 543, 547 (N.D. Ill. 2000)("The materiality of a breach depends on the 'inherent justice of the matter,' and on whether 'the matter, in respect to which the failure of performance occurs, is of such a nature and of such importance that the contract would not have been made without it.'")(citation omitted).

---

[20](...continued)
to distinguish *Schneider* is largely unavailing, as the existence of a second breach by the developers (in addition to the failure to disburse funds) in failing to inform the seller who the grantee would be, does not distinguish the case in any significant way. There is no evidence that the court's holding in *Schneider* would have been different if there had just been one material breach (as opposed to two).)

Nonetheless, even if the Court were to apply these four factors, three of the four undoubtedly favor Plaintiffs. First, Ocean Atlantic's failure to complete closing by January 25, 2001 – the absolute, final date provided for in the Settlement Agreement – defeated the bargained-for objective of the contract. While Ocean Atlantic, essentially, argues that *most* of the objectives were met (i.e. a "fairly quick" closing, the purchase price paid at one – instead of three – closings, a waiver of the sewer moratorium), the overriding point is that *all* of the material objectives were not met. As explained in depth *supra*, Plaintiffs would not have entered into the Settlement Agreement without the assurance of the finality provided by paragraph 15.

The second factor arguably favors Ocean Atlantic, as Plaintiffs were not *financially* prejudiced by the one-day delay in payment, while Ocean Atlantic forfeits, at a minimum, the $150,000 spent on the storm water detention easement and the $100,000 in earnest money.[21] Nonetheless, the Court does not find this

---

[21] At the hearing and in their briefs, Ocean Atlantic argues that it spent approximately 1.7 million dollars in developmental and professional fees necessary to entitle, improve and develop the Property. (Tr. at 50-53, 56-57.) Plaintiffs dispute this amount. In support of the 1.7 million dollar amount, Ocean Atlantic tendered a demonstrative exhibit at the hearing (Def.'s

(continued...)

prejudice to outweigh the other factors, or to negate the fundamental question regarding materiality: would Plaintiffs have dismissed their lawsuit and entered into the Settlement Agreement without the inclusion of paragraph 15.

Furthermore, although equity does abhor forfeitures, Illinois law does allow forfeiture where the contract provides for it, as the Settlement Agreement in this case does.[22] *See, e.g., Hettermann v. Weingart,* 458 N.E.2d 616, 620 (Ill. App. Ct. 1983)("although courts of equity abhor forfeitures, where a forfeiture has been

---

[21](...continued)
Exh. 2), which lists thirty items that it argues it spent money on to develop the acreage into lots. Plaintiffs objected to this exhibit, as it did not provide the underlying support/ documentation to justify Ocean Atlantic's assertion that it spent 1.7 million dollars in fees. (Tr. at 54-55.) Recognizing that discovery had not occurred, the Court held that - to the extent it mattered in the ultimate analysis (which it does not) – the Court would find that Ocean Atlantic had spent some amount of money. (Tr. at 55.) Nevertheless, giving Ocean Atlantic the benefit of the doubt (i.e. assuming that it did spend 1.7 million in developmental fees), this fact, as explained *infra*, would not change the Court's ultimate conclusion that Ocean Atlantic materially breached the Settlement Agreement.

[22] Since paragraph 15 unequivocally states that, if closing had not occurred by January 25, 2001, the "Purchaser shall have no right to purchase or encumber the Property" and that the contract "shall be terminated and Purchaser shall have no rights with respect to the Property", and because Ocean Atlantic agreed (and even helped draft) this language, being well aware that it had already spent arguably 1.7 million dollars in fees, the Settlement Agreement provides for a forfeiture.

declared in the manner prescribed by the parties to a contract the court will give effect to the contract.")(quotations and citations omitted); *Kirkpatrick v. Petreikis*, 358 N.E.2d 679, 680 (Ill. App. Ct. 1976)(contemplating forfeiture where there is a valid contract containing forfeiture clause and the buyer is found actually in default).

The third factor overwhelmingly favors Plaintiffs. The "custom and practices" prong only strengthens Plaintiffs' case, as the "custom and practice" – or prior dealings of the parties – was that a final, "drop-dead" closing date was the most essential priority for Plaintiffs, given the contentious, almost four-year history, two federal lawsuits, and several date extensions. Furthermore, Ocean Atlantic's assertion that a "one-day delay in the performance of a complex commercial real estate transaction is not an unusual occurrence and, therefore, will not normally preclude specific performance" (Def.'s Post-Hearing Brief at 7) is completely disingenuous, because, in this particular case, the unambiguous language of paragraph 15 (as well as the prior dealings) made a "one-day delay" significant.

Finally, the Court does not find that non-performance by Plaintiffs would result in an unreasonable and unfair advantage to Plaintiffs. Although Ocean Atlantic argues that it would suffer

"unconscionable prejudice," the Court is not persuaded by that argument. Ocean Atlantic is a sophisticated and experienced land development company, which has been represented by counsel since the beginning of this controversy in 1997. Ocean Atlantic made this same "prejudicial" argument in its 1998 lawsuit against Plaintiffs for specific performance (a lawsuit that it eventually voluntarily dismissed). Indeed, paragraph 20 of Ocean Atlantic's Complaint for Specific Performance in that case references its "extensive expenditure of time, effort and money to prepare the Property for development." It is now 2001, and Ocean Atlantic is, essentially, making the same argument. If Ocean Atlantic did not want to lose its investment, then it either should not have agreed to paragraph 15 of the Settlement Agreement, or it should have complied with paragraph 15 of the Settlement Agreement (or at least selected a closing date that was not one day before the final, "drop-dead" closing date).

Furthermore, it is immaterial that Plaintiffs might (and most likely will) be able to sell the Property for considerably more money than the agreed-upon purchase price. Indeed, Plaintiffs' reaping the benefits of Ocean Atlantic's efforts to improve the land is a risk that Ocean Atlantic voluntarily undertook when it agreed to - and then breached - paragraph 15 of the Settlement

Agreement. The Court sees no equitable impediment to Plaintiffs asking Ocean Atlantic to, essentially, rebid on the Property. (Tr. at 241, 265.) After all, the contract, as of the date of this opinion, has been legally terminated. It appears that, based entirely on Ocean Atlantic's conduct in this case, it will not be realizing the 15-20 percent profit it typically makes on its ventures. (Tr. at 122.)

## CONCLUSION

For the foregoing reasons, the Court denies Defendant's Motion to Enforce Settlement Agreement, and declares that the Settlement Agreement has been properly terminated, and that Defendant has no rights with respect to the Property.

**IT IS THEREFORE ORDERED** that:

Defendant's Motion to Enforce Settlement Agreement, be, and the same hereby is, **DENIED.**


DATED: February 28, 2001    Enter:

ARLANDER KEYS
United States Magistrate Judge